IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

In re:

Dennis E. Erb and
Erin R. Erb

(Chapter 7)

Debtors.

Case No. 10-13068-7

Dealer Services Corporation,

Plaintiff,

v.

Adv. No. 10-00195

Dennis E. Erb, d/b/a Glendale Motorsports,

Defendant.

MEMORANDUM DECISION

Dennis and Erin Erb filed for bankruptcy relief under chapter 7 on April 20, 2010. On July 21, 2010, Dealer Services Corporation ("DSC") commenced this adversary action against Dennis Erb d/b/a Glendale Motorsports, LLC ("Defendant") to determine the nondischargeability of its claim. A trial was held on March 30, 2011. The following facts were either admitted in pleadings or proved at the brief trial.

In late 2006, the Defendant opened a vehicle dealership called Glendale Motorsports. To purchase inventory, the Defendant executed a Demand Promissory Note and Security Agreement ("Agreement")

1

with DSC. The Agreement constituted a "floor-planning" arrangement by which the Defendant was able to purchase inventory with monies advanced to him by DSC. DSC took and maintained a security interest in all vehicles purchased by the Defendant for his inventory. Pursuant to the Agreement, once the Defendant sold a vehicle he was obligated to remit the sale proceeds in satisfaction of the balance owed to DSC within 48 hours of the sale.

From November 28, 2006 to June 5, 2007, DSC advanced the Defendant some $85,000 for the purchase of twenty-six vehicles. During this time the Defendant complied with the terms of their agreement and regularly made payments to DSC. The relationship changed after June 5, 2007, when DSC began receiving complaints from the Wisconsin Department of Transportation and from purchasers, who were disappointed when seeking titles for their vehicles. In response, DSC conducted an "audit" of the dealership that revealed discrepancies in the Defendant's documentation. The discrepancies prompted an account executive to visit the Defendant's dealership on August 1, 2007. Upon arrival, the account executive found "very few vehicles on [the Defendant's] lot." The account executive concluded on the basis of what he was told that the missing vehicles were "out" on a rent-to-own program. Without further explanation on the record (no questions relating to it having been asked by plaintiff's counsel) the vehicles, or proceeds from their sale, have not been accounted for. DSC is owed a balance of $72,000.

DSC now seeks to have the amount owed to it determined to be nondischargeable under § 523(a)(2), § 523(a)(4), or § 523(a)(6). In pursuing its claim, DSC has to prove its case by a preponderance of the evidence. *See In re Martin*, 698 F.2d 883, 887 (7th Cir. 1983); *see also Grogan v. Garner*, 498 U.S. 279, 287 (1991). DSC has failed to meet its burden of proof on each claim for nondischargeability.

DSC first argues that the debt is nondichargeable under § 523(a)(4), which states: "A discharge under section 727…of this title does not discharge an individual debtor from any debt— for fraud or defalcation while acting in a fiduciary capacity…." 11 U.S.C. § 523(a)(4). Specifically, DSC argues that the Agreement created an "express trust," and the Defendant, while acting in a fiduciary capacity committed defalcation by using the sale proceeds of its vehicles for other purposes.

To prevail on a claim under § 523(a)(4) a plaintiff must establish that: (1) a fiduciary relationship existed between the parties; and (2) the defendant committed "fraud or defalcation …while acting as a fiduciary of the trust." See 11 U.S.C. § 523(a)(4); see also Meyer v. Rigdon, 36 F.3d 1375 (7th Cir. 1994). The fiduciary relationship must arise in the context of "express trust." See Davis v. Aetna Acceptance Co., 293 U.S. 328 (1934) (finding that only an express trust will create a fiduciary relationship).

The leading case on fiduciary relationships under "floor planning" arrangements is Davis v. Aetna, which was decided almost 30 years prior to the general adoption of Article 9 of the Uniform Commercial Code. See 293 U.S. 328 (1934). In Davis, the debtor was a dealer of automobiles under a "floor planning" arrangement whereby the lender advanced funds to the dealer, and the dealer purchased inventory. Id. at 330. Once purchased, the dealer was then to hold the automobiles, as property of the lender, until the lender consented to their sale. Id. This arrangement was reflected in a promissory note, a chattel mortgage, and most importantly, a "trust receipt." Id. The trust receipt specifically acknowledged that the dealer "agreed to hold [the automobile] as property of the respondent for the purpose of storage, and not to sell, pledge, or otherwise dispose of it except upon consent in writing." Id. On the issue of nondischargeability and applying a statute substantially similar to §523(a)(4), the Court found that the trust receipt did not create an express trust. Davis, 293 U.S. at 334. Looking to the substance of the agreement, the Court opined that the dealer was holding nothing more than the dealer's

3

own property. *Id.* ("The trust receipt may state that the debtor holds the car as the property of the creditor; in truth, it is his own property, subject to a lien."). Accordingly, the "trust receipt" was not enough to constitute an "express trust" and hence no fiduciary relationship existed for purposes of nondischargeability. *Id.*

Since *Davis*, efforts to determine what language constitutes an "express trust" have proved difficult and given rise to a wide spectrum of decisions. On one end of the spectrum is the conventional "express trust," which contains "an explicit declaration of trust, a clearly defined trust *res*, and an intent to create a trust relationship." *In re Janikowski*, 60 B.R. 784 (Bankr. N.D. Ill. 1986). A fiduciary relationship arising from a conventional express trust, absolutely satisfies the first prong of § 523(a)(4). *See In re Marchiando*, 138 B.R. 548, 552 (Bankr. N.D. Ill. 1992), *aff'd*, 13 F.3d 1111 (7th Cir. 1994). Somewhat less clear, but still generally within the category of express trusts are those created by statutes such as those to protect the interest of subcontractors in funds paid to prime contractors for their work. *See Matter of Thomas*, 729 F.2d 502 (7th Cir. 1984) (citing *Carey Lumber Co. v. Bell*, 615 F.2d 370 (5th Cir. 1980)); *see also In re Dinkins*, 327 B.R. 918, 922-923 (Bankr. E.D. Wis. 2005). At the other end of the spectrum is *Davis*, holding that a trust receipt, which specifically acknowledged that the dealer-defendant would hold certain property until the lender consented to a sale, is not sufficient to establish an express trust. *See Davis*, 293 U.S. at 334.

Courts continue to struggle with whether a "floor-planning" agreement that contains "trust-like" language is sufficient to constitute an express trust.[1] *See In re Coley*, 433 B.R. 476 (Bankr. E.D. Pa. 2010) (finding language in the "floor-planning" agreement reflected nothing more than a debtor-creditor

---

[1] The Seventh Circuit has stated in *dicta* that the *Davis* case holds that "floor planning" arrangements in general do not create fiduciary relationships, and are therefore outside of the scope of § 523(a)(4). *See In re Marchiando*, 13 F.3d 1111, 1116 (7th Cir. 1994). I respectfully disagree, and submit that "floor planning" under UCC Article 9 is substantially different from that analyzed in *Davis* and that the facts of each case and especially the terms of each agreement must be considered to determine whether a fiduciary relationship has been created.

4

relationship); *In re Parr*, 347 B.R. 561, 565 (Bankr. N.D. Tex. 2006) (language stating that the sale proceeds were to be "held in trust" by the debtor "was merely a covenant in the loan agreement for the Debtor to segregate the funds and deliver them to the bank," which did not rise to the level of an express trust.); *see also In re Tinkler*, 311 B.R. 869 (Bankr. D. Colo. 2004) (acknowledging that an agreement's language, which required a dealer to segregate "funds and proceeds payable to [lender] in trust," was probably insufficient to constitute an express trust.); *but see In re Strack*, 524 F.3d 493, 500 (4th Cir. 2008) (holding that trust language requiring the dealer to "segregate the [sale] proceeds and hold the same in trust for the lender…" was sufficient to constitute an express trust under Virginia law).

In this case, DSC argues that the language in the Agreement is sufficient to constitute an express trust. The relevant language includes:

> **(3)**…Dealer hereby represents, convents [sic] and warrants: (f) To hold all amounts received from the sale of an item of Inventory financed by DSC in trust for the sole benefit of and for DSC and remit a sum to DSC sufficient to satisfy all amounts due DSC and owing by Dealer for the sold item of Inventory.
>
> **(4(e))** Dealer shall pay to DSC…, on demand and without notice, with respect to an item of Inventory or Purchase Money Inventory on the earlier of: (a) 48 hours after the disposition by sale…; or (b) Maturity date.

The language of the Agreement falls within the spectrum described above. Although the Agreement does not explicitly require segregation of the *res*, the Agreement as a whole, does seem to establish a trust relationship. The Agreement between DSC and the Defendant encompasses all elements necessary to form an "express trust"—(1) a "manifestation of intention to create" a trust; (2) trust property; (3) a trustee, who holds title to the property for the benefit of another; and (4) a beneficiary. RESTATEMENT (THIRD) OF TRUSTS § 2 (2003). (defining "trust" as "a fiduciary relationship with respect to property, arising from a manifestation of intention to create that relationship and subjecting the person who holds title to the property to duties to deal with it for the benefit of…one or more persons."). The intent to create a trust is reflected by the Agreement itself, which was signed by both DSC and the Defendant.

Case 3-10-00195-rdm   Doc 54   Filed 04/08/11   Entered 04/08/11 10:43:21   Desc Main
Document      Page 6 of 10

After a sale of inventory, the sale proceeds would serve as the trust *res*, which the Defendant then had a duty to retain and administer for the benefit of the beneficiary, DSC. While the elements may not be expressed in a separate trust document, the substance of the arrangement between the two parties cannot be ignored. Under this view a fiduciary relationship would begin, for purposes of § 523(a)(4), upon the Defendant's receipt of sale proceeds.

While the Agreement may have provided a basis for an express trust, DSC has failed to prove that any "sale proceeds" ever existed. DSC offered little proof that establishes the Defendant sold any vehicles from which sale proceeds could be derived. At trial, the only direct evidence offered by DSC that the Defendant sold any vehicles came from Zachary Gordon, an account executive of DSC. Gordon testified that Defendant's mother said she had purchased one vehicle from her son for $7,000. Had an objection been raised, Gordon's statement would have been excluded as inadmissible hearsay. Because the *pro se* debtor did not object however, I find that the testimony regarding the sale lacked credibility for the same reasons the evidence would have been inadmissible. Without direct evidence of a sale, any potential trust created under the Agreement lacks a *res*. For this reason, I cannot find that an actual trust existed and likewise that a fiduciary relationship was ever formed between the parties.

DSC also bears the burden of proving the second element under § 523(a)(4)—"defalcation while acting in a fiduciary capacity…". 11 U.S.C. § 523(a)(4). Although defalcation is not defined in the Bankruptcy Code, the Seventh Circuit has adopted a narrow definition of the word. *See Meyer v. Rigdon*, 36 F.3d 1375, 1385 (7th Cir. 1994). To support a finding of defalcation, there must be evidence showing that the Defendant "knowingly, recklessly or willfully" breached his duty to turn over the sale proceeds. *Id.* at 1385. A "mere negligent breach of fiduciary duty" is not enough. *Id.* A defendant must intentionally breach his duties. *See Id.* Remarkably, DSC presented no evidence on this element. The Defendant was never called to testify and DSC offered no other evidence (direct or circumstantial)

that would establish the Defendant had any intention to restrict DSC's access to its collateral. Without such evidence, I am unable to find that the Defendant intended to breach his duties under the Agreement. Accordingly, DSC did not establish nondischargeability under § 523(a)(4).

DSC also seeks nondischargeability under § 523(a)(6), which excepts from discharge a debt arising from a "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Specifically, DSC argues that the Defendant wrongfully converted the vehicles or the sale proceeds of the vehicles for personal purposes.

A "willful" injury under § 523(a)(6) requires "a deliberate or intentional injury" and "not merely an intentional or deliberate act that leads to an injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). In *Geiger*, the Court recognized that injuries caused by intentional torts can be characterized as "willful" where the tort in question requires proof that the actor "intend[ed] the consequences" of his or her acts. *Id.* In addition, "malice" under § 523(a)(6) means a "conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994).

Notwithstanding, a debtor who is liable for "conversion" of a creditor's property probably falls under this exception. *But see Kimzey*, 761 F.2d 421 (7th Cir. 1985), *abrogated on other grounds*, (noting that a "finding that [the] conversion was intentional is not sufficient," there also must be evidence that the conversion was malicious); *see also Nat'l Ass'n of Sys. Administrators, Inc., v. Avionics Solutions, Inc.*, 2008 WL 140773 (Bankr. S.D. Ind. 2008). In Wisconsin, a claim for conversion can be established where a defendant (1) controlled or took property belonging to another; (2) without the owner's consent; and (3) in a manner that seriously interfered with the owner's rights to possess the property. *Knox Enterprises, Inc. v. Jetzer*, 2010 WL 1881943 (Wis. Ct. App. 2010).

Conversion, as a cause of action, "is bottomed upon a tortious interference with possessory rights." *See Prod. Credit Ass'n of Chippewa Falls v. Equity Coop Livestock Sales Ass'n*, 261 N.W.2d 127 (Wis. 1978).

DSC amazingly failed to offer any evidence that the Defendant took any property that belonged to DSC. DSC only offered evidence that the vehicles were not present at the time of an inspection. The Defendant was never called to testify and in his pleadings has denied all allegations of wrongdoing. There is simply no direct evidence that DSC demanded to exercise possession or control of the vehicles (the collateral) or that the Defendant contributed to the disappearance of the vehicles. Without this critical link, I am unable to find DSC's injury was caused by conversion of its collateral.

DSC's final attempt at nondischargeability arises under § 523(a)(2)(A), which renders a debt nondischargeable when the debt is:

> [F]or money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> (A) ...actual fraud, other than a statement respecting the debtor's...financial condition. 11 U.S.C. § 523(a)(2)(A).

The Seventh Circuit has stated that "actual fraud" under § 523(a)(2)(A) includes more than a mere "mispresentation." *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000) ("§ 523(a)(2)(A) is not limited to 'fraudulent misrepresentation.'"). "Actual fraud" is said to be broader and includes, "all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *Id.* at 893. Although this exception for fraud is broadly construed, it is limited to "actual" fraud which requires proof that the "debtor intended by the transfer to hinder his creditors." *Id.* Before analyzing the definition of "fraud" any further, I can easily determine that DSC has failed to prove the Defendant intended to hinder its collection efforts. While DSC did establish that twenty-six vehicles were not accounted for while in the possession of the Defendant, it failed to establish that the Defendant made a misrepresentation or

8

engaged in surprise, trick, cunning, dissembling or other unfair means of cheating. Although not observed by DSC's inspector, there is no evidence that, if asked, the Defendant would not have turned over the vehicles to DSC. As a result, DSC has failed to meet its burden of proof under § 523(a)(2)(A).

I find that DSC has not offered sufficient evidence to establish a claim for nondischargeability. Accordingly, the Defendant's debt owed to DSC is dischargeable under § 727(a). It may so be ORDERED.

Dated: April 8, 2011

ROBERT D. MARTIN
UNITED STATES BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

In re:

Dennis E. Erb and
Erin R. Erb

(Chapter 7)

Debtors.

Case No. 10-13068

Dealer Services Corporation,

Plaintiff,

v.

Adv. No. 10-00195

Dennis E. Erb, d/b/a Glendale Motorsports,

Defendant.

ORDER

The court having reached the conclusions of law contained in this memorandum decision filed on this date, it is hereby ORDERED, that the debt owed by the debtor to Dealer Services Corporation be discharged. The Complaint filed by Dealer Services Corporation is DISMISSED.

Dated: April 8, 2011

ROBERT D. MARTIN
UNITED STATES BANKRUPTCY JUDGE